McFARLANE et al. v. GULF PRODUCTION
CO. (No. 7683.)

(Court of Civil Appeals of Texas. Galveston.
May 31, 1918.)

MINES AND MINERALS &=78(1)—OIL LEASE—
—DRILLING WELLS—CONSENT OF PARTIES.

Under oil lease conveying all oil under all
the land for fixed payment and royalties, giv-
ing lessee right to subdivide and sell, and in-
hibiting drilling well within 300 feet of resi-
dence, except with consent of "both parties here-
to, their heirs and assigns," assignee of part of
excepted circle may drill thereon, lessor consent-
ing, without consent of assignees of other parts.

Appeal from District Court, Harris Coun-
ty; T. M. Kennerly, Special Judge.

Action by J. H. McFarlane and others
against the Gulf Production Company for in-
junction. Judgment for defendant, and
plaintiffs appeal. Affirmed.

E. P. & Otis K. Hamblen, of Houston, for
appellants. F. C. Proctor and D. Edward
Greer, both of Houston, for appellee.

GRAVES, J. Under a lease contract of
date April 11, 1907, Mrs. Anna Allen Wright
sold to Patillo Higgins all the oil, gas, sul-
phur, and other minerals in and under about
75 acres of land in what is now the Goose
Creek oil field in Harris county, Tex., upon
a portion of which her home was then lo-
cated. The lease, in which Mrs. Wright
was termed first party and Mr. Higgins
second party, after providing for the right
of ingress and egress, of laying pipe lines,
maintaining tanks, constructing and oper-
ating refineries, of using such water, soil,
and other adjuncts of the land as were nec-
essary in drilling thereon and handling the
products, contained these recitations:

"It is especially understood that the party of
the second part shall have the right to convey
all of this lease contract, or any part thereof,
to individuals or corporations whom he may
desire.

"It is further understood, agreed and stipulat-
ed that the party of the first part in executing
this instrument intends the same as a convey-
ance of all the oil, gas, sulphur and other min-
erals in and under the land described in this in-
strument as herein set out, and that all the
conditions herein mentioned shall extend to the
heirs, executors, administrators and assigns of
both parties herein named.

"It is understood by both parties hereto that
no wells shall be drilled within 300 feet of the
residence now on said land herein described un-
less with the consent of both parties hereto,
their heirs and assigns."

Higgins then subdivided and platted the
75 acres, conveying his rights in different
parcels of it according to the plat to vari-
ous purchasers, among whom were the par-
ties to this litigation, appellants having ac-
quired lot 10 of the plat, embracing about
3.58 acres, and upon which the 300 foot
zone, or "Reserve" around Mrs. Wright's
residence impinged to the extent of $7/100$ of
an acre, the entire "Reserve" inclosing 7½
acres; while the appellee acquired adjoining

lot 11 of this subdivision, which contained
about 15 acres, and included within it all
of the "Reserve," except the small portion
so extending over into lot 10. In other
words, the barred zone, or the "Reserve,"
was a circle described from Mrs. Wright's
residence as its center, upon a radius of
300 feet, and inclosed within its circumfer-
ence 7½ acres of land, the whole of which
lay within lot 11 belonging to the appel-
lee, except a small segment containing $7/100$
of one acre, which bit into lot 10, owned
by the appellants.

Both parties were assignees under Hig-
gins as to the tracts so respectively held by
them, and accordingly were in the same
manner entitled to just such rights, bene-
fits, and privileges, and likewise subject to
such burdens, as were given to or imposed
upon them, respectively, as his assignees by
virtue of the terms of Higgins' lease from
Mrs. Wright; both were further in posses-
sion of and producing oil, respectively, from
portions of the two tracts in which they
owned the rights described, except that nei-
ther had ever drilled or attempted to drill
a well within the 300-foot circle before the
preparations of the appellee to do so, next
herein referred to.

With the parties sustaining the relations
toward the property and each other as out-
lined, and upon them as a basis, appellants
sued the appellee in the court below seeking
judicial construction of this Higgins' lease,
and, in the event the court should hold that
its terms forbade the drilling for oil in any
part of the "Reserve" without their consent,
as was their contention, asking that the
appellee be perpetually enjoined from so
doing. Pending final disposition of the case,
a temporary injunction to the same end
was prayed for, upon further allegations
that the appellee was then about to begin
the drilling of one or more wells upon that
part of the "Reserve" lying immediately
between their leasehold and Mrs. Wright's
residence, and within about 40 feet of their
line; that appellee had recently obtained
the consent of Mrs. Wright to so drill, but
neither had nor could obtain their consent,
because of the damage it would do them;
and that the contemplated drilling would
so peculiarly and irreparably injure them
and their property rights as to make any
other remedy than complete prohibition of
it by the writ of injunction wholly inade-
quate, in that the oil would thereby be drain-
ed from under their land, entailing loss of
revenue, depreciation in the value and sala-
bility of their holdings, etc.

The court conducted a hearing to deter-
mine whether or not the temporary injunc-
tion asked for should issue, at which the
appellee appeared and answered, submit-
ting its general demurrer to the petition

&=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of appellants for injunction, and with the latters' consent, also presenting a new and more recent lease direct to it from Mrs. Wright, covering the 2½ acres in the north end of lot 11 which adjoined appellants' south line, and purporting to grant it the right to drill thereon the wells the court was asked to enjoin. Holding that their petition failed to disclose such facts as made appellants' consent necessary before the appellee could drill upon the "Reserve," as contemplated by it, the court sustained its demurrer, and refused the temporary injunction. From that action this appeal is prosecuted.

The order appealed from, after reciting that the question raised by the demurrer was the proper construction of the Higgins lease, particularly paragraph 15 thereof, and that the obvious intention of the parties thereto was not only to pass to Higgins the title to all the oil, gas, sulphur, and other minerals within the 300 foot zone, but also to protect the residence then located thereon from fire, smoke, noise, etc., thus concludes:

"Such zone and the agreement of the parties relative thereto was for the protection of such residence and for the benefit of the person or persons owning such residence, and only the parties to such conveyance, claiming some interest in such residence or some person holding under the parties to said lease and claiming some interest in said residence, would be entitled to restrain the owner of the oil and other minerals on, in, and under said zone from drilling a well within said zone.

"Plaintiffs by their application do not bring themselves within that class of persons, and for such reason are not entitled to restrain the drilling of oil wells within such zone. Upon such ground, the defendant's demurrer is sustained, and the temporary injunction prayed for by plaintiffs is therefore refused."

We find no fault with this conclusion of the trial court, and an order affirming its judgment has been entered.

It was also correctly held that the rights of the parties were to be determined by the proper construction of the Higgins lease. In accord with the facts previously mentioned, the court had found that the appellee, at the time of obtaining the new lease direct from Mrs. Wright, already owned, as the assignee of Higgins, all the rights in the land it covered that the latter had acquired by virtue of his original lease from Mrs. Wright, which lease was then in full force and effect, so that she had nothing further to convey and it acquired nothing additional under the new lease.

Appellants contend that the stipulation that no wells shall be drilled within 300 feet of the dwelling house unless with consent of both parties, their heirs and assigns, is a covenant running with the land, and created in their favor, as the owners of abutting property, such a servitude upon the entire "Reserve" as entitled them by injunction to prevent the drilling, without their consent, of wells on any part of it. In up-

holding the conclusion of the court below, however, we find it unnecessary to pass upon whether this provision was personal, or a covenant running with the land, because we think the reasonable construction of it, under the surroundings and situation of the parties, considering also the language used throughout the instrument, indicates that the parties in making it did not intend to so burden the property; and, in the interpretation of covenants, both as to their nature, character, and meaning, as of contracts generally, the cardinal principle is that the intention will prevail. 7 Ruling Case Law, pp. 1085, 1086, Covenants, pars. 3 and 4.

The 75 acres leased to Higgins lay in a long narrow strip about 4,000 feet long by about 800 feet wide; the title to the minerals under it all, including the 300-foot zone reserved, together with the exclusive right to drill and produce oil thereon, was conveyed to him (Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989), he being required to pay the taxes, an annual money consideration, and also royalties upon the whole; the right to subdivide and sell the tract ad libitum was granted him and his assigns, with the proof showing that he had in fact cut it into and sold 12 small tracts, with the "Reserve," which lay almost entirely within one and only touched one other of these subdivisions, containing only about 10 per cent. of the whole.

As expressive of our own view of the considerations upon which the trial court's construction of the contract may be sustained, we take the liberty of quoting, with very slight changes, these excerpts from the able brief filed in this court by counsel for the appellee:

"Mrs. Wright had her home on the land, and she knew that if wells were drilled close up to her residence the same would become uninhabitable by reason of bad odors, slush, mud, unsightly derricks, and machinery; and in addition to all of this there would be great danger of fire. She therefore wished to protect her home by adjacent land from any close proximity of wells and all the disagreeable incidents attendant on having them close to her house; but, notwithstanding this, she evidently contemplated that there might come a time when she would prefer to abandon her home and move away and have the acreage in the reserve developed, otherwise she would simply have excluded the reserved area from the lease, would not have required the lessee to pay the taxes thereon, and would not have put herself in the position thus to have leased separately this tract if she desired to do so. Therefore she made the provision as to no wells being drilled within 300 feet of her home unless she consented.

"On the other hand, Higgins had bought the minerals under the entire tract, including the 300-foot reserve, with the right to develop same; and, if the clause had been so written as to allow drilling in the reserve on procuring Mrs. Wright's consent alone, Higgins was doubtless afraid a clause so phrased would allow Mrs. Wright to consent to some one else than Higgins or his assigns drilling on the reserved area. Hence he stipulated against such construction by providing that the consent of himself or his assigns also should be necessary before any drill-

ing on the reserved area should take place. It may be argued that it was not necessary to so stipulate, because it is uniformly held that a reservation against drilling in a designated part of a leased tract does not take the designated part of the lease, and the lessor could not authorize a third party to drill in such designated area; but we must remember that this lease was made in 1907, and therefore perhaps before many of the cases so holding were decided, that the point had never been decided in this state, and from the number of cases which have been carried to the higher courts by eminent lawyers the point was evidently deemed and considered very doubtful. See Archer on Oil and Gas, p. 170 et seq. It was therefore nothing but proper prudence and caution on the part of Higgins to stipulate that no wells should be drilled on the reserved area without his consent, when Mrs. Wright had stipulated that they might be drilled with her consent. This entirely answers the suggestion of appellants that it would be absurd for Higgins to stipulate that his own consent must be procured before he could drill; he was providing against Mrs. Wright's authorizing some one else than himself or his assigns to drill on the reserve.

"The obvious meaning, then, of the restriction, is that the lessee shall drill no wells in the reserved area without the consent of the lessor, and that the lessor or grantor shall not have the right to authorize or grant the right to drill in such area to any one other than the lessee or his assigns. So construed, then, what is meant by the requirement 'that no wells shall be drilled within 300 feet of the residence now on said land herein described unless with the consent of both parties hereto, their heirs or assigns,' with respect to the consent of the assignees?

"Let us first consider it from Mrs. Wright's point of view. She was leasing a long narrow strip of land; she evidently wished the land to be developed and all of the oil gotten out of it for the purpose of securing to herself an income or profit. She was desirous, however, of at least temporarily living on the land, and for the reason already pointed out she wished her home to be as little interfered with as possible, until she could come to the conclusion that it would be better to abandon it, move away, and devote the reserved area (along with the balance) to the production of oil. She evidently contemplated that at some time in the future she would prefer to give up her home and have the site developed for oil, if the land proved to be valuable for that purpose. At the same time she contemplated that Higgins, her lessee, would cut up the tract and sell out numerous small tracts, and that the purchasers would thus become assignees. Is it conceivable that she intended to put it into the power of each of these assigns to prevent her from having the home site developed if she should conclude to move away and abandon her home? Thus construed, the contract is not a restriction or reservation in her favor, but so against her interest that it is manifest she had no such intention. Under the agreement that Higgins could sell any part of the land, he could have sold, say, one-half an acre in the northeast corner of the tract three-fifths of a mile away from her home, and under the construction put upon the clause by appellants she could not have authorized Higgins himself to drill any well on her home site if this assignee objected. Such a construction and conclusion leads to an absurdity, and in law as well as in logic an absurd conclusion or construction shows the premise to be wrong.

"Now consider it from Higgins' point of view. He expected to sell parts of the land, since he stipulated for that right. Suppose, as above, that he had sold one-half an acre in the northeast corner. Is it conceivable that he intended that, after obtaining Mrs. Wright's consent to drill on the home site, he must also obtain the consent of this vendee of the one-half acre? Did he so intend to restrict his rights, and im-

pair—seriously impair—the value of his remaining holdings? Here again the construction of appellants leads to an absurd result, and must therefore be wrong.

"From what has been said it seems to us clear that neither party intended that any and every assignee of a part of the leased tract, no matter how small or how remotely situated from the reserved area his tract might be, should have the right to object to wells being drilled on such reserve. Yet, following the settled rules of the construction of contracts, we must, if we can, give some effect to the provision requiring the consent of Higgins and his assigns. We believe an entirely sufficient effect is given to this provision by construing it as relating or referring only to wells to be drilled by others than the lessee or his assigns. We have pointed out that, if the lease had been left with the provision simply prohibiting the drilling within the reserve except with the consent of Mrs. Wright, the claim would most probably be made that she could give her consent to outsiders or third parties to drill on the reserve. Even if we suppose that Higgins knew of the cases holding that she would have no such right, then he also knew that the right had often been claimed or asserted, and that the question had never been decided in this state; and he therefore knew that he might be exposed to expense and annoyance in defending lawsuits, so he provided against such in the contract itself, which was only prudent.

"But there is another way in which the language of the lease can be given full and complete effect without giving it the effect claimed by appellants. As stated, the lease itself provides that the lessee may sell and convey all or any part of the premises; it was therefore contemplated by the parties that this would be done. When Higgins sold parts of the land, or his rights therein, the lease was cut up into just so many parts as he had sold; the purchaser became the lessee or grantee, and Mrs. Wright his lessor or grantor; and under precisely the same conditions and obligations, so far as applicable to his tract, as if said purchaser or lessee had alone originally purchased or leased the tract which he bought or leased from Higgins. Mrs. Wright, having consented in advance that Higgins could cut up the land and sell it out to others, was estopped from claiming any injury to her or any violation of her rights by Higgins so doing. Therefore, whenever any one purchased a tract which embraced a part of the reserve he had the agreement with Mrs. Wright that she should not grant to any third party the right to drill on the part of the reserve inclosed in his tract, and she had a contract that he should not drill on that part of the reserve included in his tract without her consent.

"From what has been said, we believe it is demonstrated that the lease did not require the consent of all the assignees of Patillo Higgins to drilling within the reserved area. Appellants contend that, as their land embraces a small part of the reserved area, their consent is required, even if the consent of all of the assigns of Higgins is not. But this manifestly cannot be so. If appellants cannot maintain their contention that the provision of the lease is plain and needs no construction, but must be given effect as written, and therefore requires the consent of all assigns under Higgins, they have lost their case, because we must then construe the language used to find the intention of the parties, and when we do so we must conclude that the intention was: First, that so long as the lease was held by Higgins and his assigns in an undivided condition, no third party should be allowed to drill on the reserved area without the consent of Mrs. Wright and of Higgins or his assignee, holding the entire lease; second, that if the lease was cut up by parts being sold, no wells should be drilled on that part of the 300-foot reserve embraced in such severed

or sold part without Mrs. Wright's consent and the consent of the owner of such sold or severed tract. This is evident from the fact that Mrs. Wright wished to preserve the home reserved area from drilling so long as she desired, but also wished to have the right to allow drilling if she abandoned her home; and Higgins wished to secure to his vendees the right to prevent Mrs. Wright from giving her consent to a third party to drill on such portion of the reserve."

Affirmed.

---

⚖==For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes